[Crim. No. 6519.   Second Dist., Div. One.   June 11, 1959.]

THE PEOPLE, Respondent, v. ROBERT JAMES DILLS, Appellant.

Bradford A. Arthur for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Marvin L. Part, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment and sentence and from the denial of a motion for a new trial in a cause wherein the defendant was convicted of first degree robbery.

In an information filed in Los Angeles County, the defendant was charged with robbery in violation of section 211, Penal Code; and further it was charged that the defendant previously had been convicted of robbery on or about January 7, 1955, and had served a term in prison therefor. The defendant pleaded not guilty and denied the prior conviction. A jury trial was waived and it was stipulated that the matter be submitted on the transcript of the preliminary hearing, each side reserving the right to introduce further evidence, and each side did introduce further evidence at the trial. The court found the defendant guilty as charged, and found the prior conviction to be true and sentenced the defendant to the state prison, the sentence to run concurrently "with time owing on parole" for the prior robbery.

The facts are substantially as follows: Mrs. Mildred Delpit was employed as a secretary in the office of Walker's Music Company, which had its place of business on West 96th Street, in Los Angeles. On June 16, 1958, about 4:50 to 5 o'clock p.m., a man of stocky build, about five feet three inches tall, dressed in a "parcel post uniform" came to the Walker place of business with a package apparently for delivery. Upon gaining entry, the man held out a gun and said "This is a holdup." The man gave to Mrs. Delpit a roll of friction tape and ordered her to bind up the remaining employees with the friction tape, and she complied with his directions. The robber then demanded money, and Mrs. Delpit took

from the files some money, which she estimated to be about $5,000 in amount, and handed it to the man in a container. The man then left, and she called the police.

Mr. Howard Byham resides on West 96th Street, a short distance from the Walker place of business. At or about the time in question, he was in his yard doing some watering, and he observed a cream or light colored car, which was smaller than the usual American-built car, parked about 60 to 70 feet from where he was working. He saw a man get out of the car and then get back into it. Byham further testified at the trial that the defendant "resembles very much the man that walked to the back of the car," "I am pretty sure he is the man." While Byham was in the yard a man dressed in what appeared to him to be a "uniform of some kind with a cap that matched," with a package in his right arm, ran down the alley from the direction of the Walker store to the car, saying, "Go, man, go." The man in the uniform got into the car and it drove away. Byham got the number of the automobile and immediately wrote it down on an old envelope. Shortly thereafter the police arrived and Byham went out to where they were and told them the number of the car which he had observed pulling away. He stated that the number was NAU 936, and gave the police the envelope with the number written thereon.

Abel Armas, one of the arresting officers, stated that he had received information from police department sources that a car bearing the number on the envelope had been used in a robbery. That night he, with his partner, went to the residence of the registered owner of the vehicle, who was the defendant's mother. The mother advised the police that the car was a 1957 Hillman Minx, and that she owned it, but that it was being driven by her son. The officers then went to the address of the defendant's apartment, and in the parking lot at such apartment, located the Hillman Minx automobile in question. The officers then went to the defendant's apartment about 2:00 o'clock a.m., June 17th, and knocked several times on the door, to which there was no reply. They then obtained a pass key from the manager and entered. In the apartment they found Carol Stafford (who, it was later determined, was a girl friend of the defendant) who stated to the police that no one else was there. The officers made a search of the apartment and found the defendant hiding in a clothes closet. A further search turned up a roll of friction tape, a box of .45 caliber ammunition

and $1,237 in cash in a dresser drawer. The defendant was questioned by an officer, and the officer testified that the defendant said among other things, "No one drives the car except me and sometimes Carol;" and that there was only one set of keys to the automobile. The defendant was then asked, "who was driving the car tonight?" and he answered, "Carol," and then added, "But she didn't have anything to do with it." The defendant told the officers that he had given $200 to Carol to take over to his mother to be used in making the payments on the car. As to the shells which were found, he told the officers, "I don't know where the shells came from,"—"I don't keep a gun in the house." As to the money found in the dresser drawer, the defendant said he had won it at a race track, and that he had not worked since February.

The defendant testified at the trial in his own behalf, and said in effect, that he had previously been convicted of first degree robbery and that he was then on parole, and that he had been in his apartment all day on the 16th, excepting to go out about 4:45 o'clock p.m., to the store for some cigarettes for Carol.

Carol Stafford testified, in effect, that she maintained an apartment across the hallway from Dills', where she kept some things, including the wearing apparel of her child; that she lived with Dills; that on the night in question he had given her $200 cash to give to his mother as payment on the car; that in the early morning of the 17th of June, she heard someone making a lot of noise at the door of the apartment where she and Dills were sleeping, that she did not answer the knocks at the door; that the officers came in; that she signed a statement with reference to the money which set forth in part, "I asked him where it came from and he said, 'Don't ask me. I have told you before not to ask any questions,'" and "When he came at 5:05 he gave me $200.00 to take to his mother's;" further that she found some money ($1,237) in the dresser drawer that night, and that she did not know where that particular money came from.

An officer testified that he talked to the defendant and told him that his license number had been obtained at the scene of the robbery and then the defendant was asked who the other man was who was in the robbery, where the gun and the rest of the money were, and the defendant's only answer was, "I have nothing to say."

260

The appellant now contends that, (1) the evidence is insufficient to sustain the judgment of conviction, and (2) that the trial court erred, as a matter of law, in failing to apply the presumption of innocence and the doctrine of reasonable doubt in considering the evidence.

It is readily apparent from the résumé of the evidence heretofore given that there was ample and sufficient evidence to sustain the judgment. █ It is not our right or duty to resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. (*People* v. *Tedesco*, 1 Cal.2d 211, 219 [34 P.2d 467] ; *People* v. *Tom Woo*, 181 Cal. 315, 326 [184 P. 389] ; *People* v. *Vest*, 65 Cal.App.2d 774, 779 [151 P.2d 666] ; *People* v. *Deysher*, 2 Cal.2d 141, 149 [40 P.2d 259].)

█ The trial court heard and saw the witnesses. The judge evidently disbelieved the alibi witnesses and the defendant, and did believe Byham, Mrs. Delpit and the police. Such was the province of the judge, and our reading of the record leads us to the same conclusion reached by the trial court. But whether or not we reach the same conclusion means little for it is the trial judge who makes the determination under the law. (*People* v. *Frankfort*, 114 Cal.App.2d 680, 689 [251 P.2d 401].) █ The identification was ample. (*People* v. *Houser*, 85 Cal.App.2d 686, 694 [193 P.2d 937] ; *People* v. *Weems*, 157 Cal.App.2d 753, 755 [321 P.2d 884] ; *People* v. *Mahoney*, 146 Cal.App.2d 485, 498 [304 P.2d 73].)

█ One who stays in an automobile and enables or assists those who are doing the actual robbing to make a successful "getaway" is as much a principal, and aids and abets the crime completely as though he were present and assisted in the actual taking of the property. (*People* v. *Silva*, 143 Cal.App.2d 162, 169 [300 P.2d 25].)

█ Before this court can reverse the case upon the grounds of insufficiency of the evidence, ". . . it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) Such a situation does not exist in this case.

There is no merit to the appellant's second contention. The record completely belies any assertion to the effect that the trial court failed to apply the presumption of innocence and the doctrine of reasonable doubt in favor of the defendant.

We have reviewed the entire record in this case and we

find no error. The appellant, in effect, is simply asking this court to reweigh the evidence, and he insists that if we do so, we would surely be convinced that the proof offered was not sufficient to convict the defendant as charged. The judge in this case was convinced of the guilt of the defendant beyond question, and properly so.

The purported appeal from the "decision" of the court, and from the sentence is dismissed. (*People* v. *Gallardo*, 41 Cal.2d 57, 60 [257 P.2d 29].) There was no motion for a new trial, and consequently the purported appeal from the nonexistent denial of the defendant's motion for a new trial is dismissed.

The judgment is affirmed.

White, P. J., and Lillie, J., concurred.